# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2346

_____

Joshua Rawa, on behalf of himself and all others similarly situated; Elisabeth Martin; Robert Ravencamp; Amy Ward; Cynthia Davies; Christopher Abbott; Owen Olson; Jeannie A. Gilchrist; Zachary Sholar; Matthew Myers; John W. Beard, Jr.; Michael Overstreet

*Plaintiffs - Appellees*

v.

Monsanto Company

*Defendant - Appellee*

v.

James Migliaccio

*Objector - Appellant*

Patrick Sweeney

*Objector*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 16, 2019
Filed: August 20, 2019

_____

Before SMITH, Chief Judge, ARNOLD and KELLY, Circuit Judges.

_____

SMITH, Chief Judge.

Appellant-objector James Migliaccio was a member of a California class action against Monsanto Company that alleged the company used misleading labeling on its Roundup concentrate herbicide. Following certification of the California class in the Central District of California, class counsel filed the present action in the Eastern District of Missouri on behalf of a putative class of consumers from the other 49 states. The parties reached a nationwide settlement agreement. The Central District of California transferred the California action to Missouri, where Monsanto resides, in order to consolidate the cases and seek preliminary approval of the nationwide settlement. The federal district court[1] in Missouri granted preliminary approval of the settlement and its notice plan. After the notice period ended, the plaintiffs filed for final approval of the settlement. Migliaccio objected to certification of the nationwide class and to the fairness of the settlement on several grounds. The district court overruled his objection and granted final approval. Upon review, we conclude that the class members were adequately represented and that the settlement was reasonable, fair, and adequate. We therefore affirm.

## I. *Background*

Monsanto manufactures and markets Roundup, a well-known herbicide, in both concentrate and ready-to-use forms. The company marketed its concentrate products, which require dilution before using, as a better value for consumers. In this class action lawsuit, plaintiff consumers alleged that Monsanto misled them about the concentration strength of these products through its product labeling. In doing so, plaintiffs claim, Monsanto implicitly misrepresented their value—by nearly 50

_____

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

percent on some units. As an example, one product's label advertised that it could be used to make up to ten gallons. But consumers discovered that, when diluted according to package instructions, the product only made just over five gallons.

Class counsel originally filed the suit in the Central District of California on behalf of a nationwide class. The court, however, eventually certified only a California class. Class counsel subsequently filed a complaint in Missouri, Monsanto's principal location, on behalf of a putative class of consumers from the other 49 states. The complaint alleged violations of both federal and Missouri laws. The parties negotiated and reached a tentative nationwide settlement. Other similar actions had been filed in courts across the country, and class counsel reached out to the plaintiffs in each case to advise them of the settlement's terms. Each agreed to support the settlement in exchange for class counsel's promise to seek incentive awards and reimbursement for costs and fees.

Class counsel moved the Central District of California to transfer the action to the Eastern District of Missouri, seeking consolidation with the 49-state class action. The court granted the motion.

The plaintiff class then moved the federal district court in the Eastern District of Missouri for preliminary approval of the nationwide settlement, which covered over four million retail units representing about $164 million in retail sales. The motion set forth a notice plan, designed by the class administrator, which estimated a class size of approximately 3.5 million members who bought the products during the relevant time period. The notice plan targeted over 20 million people who had used weed killer products in the past. The plan assumed that the class members would be included among that number and receive adequate notice of the settlement. The court granted preliminary approval of the settlement and approved the proposed notice plan.

According to the terms of the settlement, Monsanto would establish a $21.5 million non-reversionary Common Fund for claims, notice, and administration costs; incentive awards; and attorneys' fees. Class counsel could apply for fees up to one-third of the Common Fund for their services. Any remaining unclaimed funds would be donated to *cy pres* recipients.[2]

After the notice period ended and the claims were processed, the plaintiffs moved for final approval of the settlement and for attorneys' fees. The class administrator testified that it had validated a total of 70,360 claims, valued at $10,732,832. Since the claims correspond to a 50 percent refund for the consumers' affected purchases, the class administrator testified that the value of the claims represented over $21 million in retail sales. Because Monsanto made $164 million in retail sales for the relevant period, this produced a claims rate of 13 percent. Class counsel sought one-third of the Common Fund ($7,166,666) for attorneys' fees.

Migliaccio filed an objection opposing class certification and final approval of the settlement. He asserted that consolidation of the California class with the nationwide class diluted the California class members' claims, creating a conflict of interest for the nationwide class counsel that rendered their representation inadequate. Prior to transfer and consolidation of the California- and Missouri-based classes,

---

[2]*Cy pres* (from the expression *cy pres comme possible*, meaning "as near as possible") is an equitable doctrine with origins in trust and estates law. *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682 (8th Cir. 2002).

> In the class action context, it may be appropriate . . . to use *cy pres* principles to distribute unclaimed funds. In such a case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated.

*Id.*

counsel consulted with a legal ethics expert to address potential conflict-of-interest concerns. Based on the expert's advice, counsel represented to the court that no conflict existed. Migliaccio challenged the fairness of both the proposed settlement terms and the attorneys' fee award. He demanded that the nationwide class counsel produce the expert ethics opinion sought before the transfer, and he urged the court to perform a lodestar cross-check on the attorneys' fee award.

The court asked class counsel to submit detailed billing records and rates to support the motion for attorneys' fees and then held a two-hour fairness hearing, in which Migliaccio participated. Following the hearing, the court entered an order granting final certification to the nationwide class, final approval of the settlement, and attorneys' fees totaling 28 percent of the Common Fund.

## II. *Discussion*

Migliaccio raises four issues on appeal. First, he challenges the final approval, arguing that the district court based its fairness analysis on erroneous facts. Second, he avers the court failed to uncover ethical conflicts that made class certification inappropriate. Third, he contends the award of attorneys' fees is too high. Fourth, he argues the *cy pres* distribution of funds remaining in the Common Fund once all expenses are deducted is inappropriate and should instead be returned to class members. In response, the class action plaintiffs argue that Migliaccio lacks standing to bring this appeal because he could not receive any benefit from a favorable outcome.

### A. *Standing*

Before reaching the merits of his arguments, we first address the plaintiffs' assertion that Migliaccio lacks standing to bring these claims. They note that "class members lack standing to appeal aspects of a class action settlement that do not adversely affect their own interests." *Huyer v. Van de Voorde*, 847 F.3d 983, 987 (8th Cir. 2017). They assert that Migliaccio lacks standing to challenge the fairness of a

settlement that fully compensates him for his claimed out-of-pocket losses. Similarly, they claim he lacks standing to appeal the award of attorneys' fees because, according to the terms of the settlement agreement, any fees deemed excessive would be returned to the Common Fund and distributed to *cy pres* beneficiaries rather than to class members.

"To show standing under Article III of the U.S. Constitution, a plaintiff must demonstrate (1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury." *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (internal quotation omitted). "The standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). Migliaccio asserts the district court relied on erroneous factual findings in determining the settlement was fair, reasonable, and adequate. He also contends that he would have received a more favorable outcome under California state law had the classes not been consolidated. His challenge to the settlement's distribution of funds, if successful, would yield a higher recovery for class members. These allegations support his having standing to dispute the settlement and class certification. *See Keil v. Lopez*, 862 F.3d 685, 699 (8th Cir. 2017) (concluding an objector had standing because "if the settlement agreement either adjusted recovery to account for the relative strength of all fifty states' consumer protection laws or simply provided greater recovery for class members . . . , [the objector] presumably would receive more money").

We need not address standing with respect to a review of the fee award because "the reasonableness of the attorneys' fees is within the overall supervisory review of this court." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 127 n.13 (8th Cir. 1975). Migliaccio argues that any reduction in attorneys' fees should inure to the benefit of class members rather than defaulting to the terms of the settlement, which

-6-

provide that net funds remaining in the Common Fund will be distributed to *cy pres* recipients. Because he made this argument below, we may address whether the district court erred by refusing his request.

### B. *Substantive Claims*
### 1. *Settlement Approval*

We review a district court's order approving a class action settlement for an abuse of discretion. *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015). In so doing, "we ask whether the district court considered all relevant factors, whether it was significantly influenced by an irrelevant factor, and whether in weighing the factors it committed a clear error of judgment." *Id*. (cleaned up).

Migliaccio asserts that the nationwide class consists of approximately 3.5 million members. He derives this figure from estimates made prior to the class notice period. In designing a notice plan, the class administrator used market research data to "estimat[e] that the class size [was] approximately 3.5 million persons and that a target audience of 20.08 million persons who have used weed killer products include[d] the members of the class." Mem. in Support of Consent Mot. for Prelim. Approval, Attach. 3 at 4, *Rawa v. Monsanto Co.*, No. 4:17-cv-01252-AGF (E.D. Mo. Oct. 4, 2017), ECF No. 32-3. The district court did not address this figure in its final approval analysis. Instead, it adopted the plaintiffs' reasoning following the claims period: "[B]ecause 13% of the product was claimed by 70,360 members, the evidence suggests the Class contains about 541,000 members." Pls.' Reply in Supp. of Mot. and Resp. to Obj. at 1 n.2, *Rawa v. Monsanto Co.*, No. 4:17-cv-01252-AGF (E.D. Mo. Apr. 3, 2018), ECF No. 49. The district court conducted its fairness analysis using these figures. The district court commended the settlement's full compensatory recovery for claimants and emphasized the considerably high claims rate. *See Keil*, 862 F.3d at 697 (observing "that a claim rate as low as 3 percent is hardly unusual in consumer class actions and does not suggest unfairness").

"The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988). Migliaccio contends that the court's use of "grossly inaccurate figures" led it to misjudge the overall value of the settlement. Appellant's Br. at 13. However, Migliaccio fails to show that these figures are flawed and is unconvincing that the court should have based its analysis on pre-notice market research estimates rather than a simple, evidence-based calculation. So, we hold the district court did not abuse its discretion in granting final approval of the settlement.

## 2. *Class Certification*

We review the district court's decision to certify the settlement class for an abuse of discretion. *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 973 (8th Cir. 2018).

Migliaccio argues that class counsel became inadequate due to conflicts that arose from the transfer and consolidation of the California class. He contends the transfer and consolidation ultimately "diluted California class members' claims." Appellant's Br. at 4. Migliaccio devotes much of his argument towards showing that the California class members received much less per member under the nationwide settlement when compared to a hypothetical recovery that they would have received absent consolidation.[3] He also seeks disclosure of the ethics opinion that class counsel sought prior to transfer. He does not, however, name a specific potential conflict that concerns him.

---

[3]Migliaccio's calculations are premised on a number of estimates: the pre-notice estimated nationwide class size of 3.5 million members; a similarly estimated California class size; and an assumption that the California class would "achieve[] the same 30% recovery of estimated damages as the $21.5 million settlement represents of the $70.5 million estimated damages for the nationwide class." Appellant's Br. at 21.

Any California class member who submitted a valid claim recovered *at least* 100 percent of his or her alleged out-of-pocket damages under the nationwide settlement. The settlement's per-unit payment to claimants is higher than what plaintiffs sought through the damages model in the abandoned California case. Even if punitive damages are available to successful litigants under California consumer protection laws, "the outcome of the litigation was far from certain." *Keil*, 862 F.3d at 696. A nationwide settlement need not account for differences in state laws. *Id.* at 700. Moreover, "a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *Id.* at 696 (internal quotation omitted). On this record, Migliaccio has failed to show how the California class members' claims were diluted.

He also maintains that the transfer and consolidation created a conflict for class counsel. Though he has not asserted precisely what that conflict is, he says "class counsel recognized the conflict," as evidenced by their decision to consult with an ethics expert before asking the California court to transfer the case. Appellant's Br. at 22. The district court adequately addressed his concerns at the fairness hearing:

> [T]he fact that an attorney consults someone to make sure that they are on solid ground is not an admission of a conflict. That is a lawyer taking prudent steps when they have an obligation to a class. . . . I take that as a sign of responsible behavior by class counsel and not some admission that a conflict exists.

Tr. of Fairness Hr'g at 58, *Rawa v. Monsanto Co.*, No. 4:17-cv-01252-AGF (E.D. Mo. May 14, 2018), ECF No. 57.

Migliaccio has failed to show how the California class members have been disadvantaged by their inclusion as members of the nationwide class. We find no

abuse of discretion in the district court's refusal to order production of the expert ethics opinion.

### 3. *Attorneys' Fee Award*

We review the district court's award of attorneys' fees for an abuse of discretion. *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1156 (8th Cir. 1999). The district court has discretion to use either a lodestar or percentage-of-the-fund method in determining an appropriate recovery, "and the ultimate reasonableness of the award is evaluated by considering relevant factors from the twelve factors listed in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 719–20 (5th Cir. 1974)." *In re Target Corp.*, 892 F.3d at 977 (cleaned up). The district court has the burden of "provid[ing] a concise but clear explanation of its reasons for the fee award." *Id.* (internal quotation omitted). "We give substantial deference to a district court's determinations, in light of the district court's superior understanding of the litigation." *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 871 (8th Cir. 2014).

Class counsel requested a fee award totaling 33 percent of the Common Fund. After considering the *Johnson* factors, the parties' arguments, the attorney billing records, and the relevant case law, the district court determined that an award of 28 percent of the Common Fund was appropriate. The court acknowledged that "[t]he corresponding lodestar multiplier of 5.3 is still quite high compared to similar cases in this circuit," but it concluded it was not unreasonable in light of the results obtained. *Rawa v. Monsanto Co.*, No. 4:17-cv-012520-AGF, 2018 WL 2389040, at *9 (E.D. Mo. May 25, 2018). The district court decided that a generous award was warranted based on "the novelty and uncertainty of the claims, the skill required by counsel to perform the work properly, especially on a nationwide basis, time limits imposed in the [California case], the experience and ability of the attorneys, and significantly, the large amount involved and excellent result achieved." *Id.* The court also cited class counsel's general efficiency as well as the effectiveness of the notice process to justify the award.

-10-

Migliaccio uses the same estimated class size and claims rate figures again to dispute the quality of the settlement's terms. He takes issue with the district court's weighing of the *Johnson* factors. He also disputes certain hours in the billing records submitted by class counsel.

The fee award in this case is in line with other awards in this circuit. *See Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017) ("Indeed, courts have frequently awarded attorneys' fees ranging up to 36% in class actions."). And while the 5.3 lodestar multiplier is high, it does not exceed the bounds of reasonableness. *See, e.g.*, *In re Charter Commc'ns, Inc., Sec. Litig.*, No. 4:02-cv-1186-CAS, 2005 WL 4045741, at *18 (E.D. Mo. Jun. 30, 2005) (finding reasonable a 5.61 cross-check multiplier and noting that "[t]o overly emphasize the amount of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services" (internal quotation omitted)). The district court adequately explained the reasons for its decision, and the result is not obviously unreasonable in light of our prior case law.

Migliaccio presented his billing record disputes to the district court at the fairness hearing. In its order, the district court stated that it had taken both the parties' arguments and the submitted billing records under "careful consideration" in determining the fee award. *Rawa*, 2018 WL 2389040, at *9. We find that the district court "fulfilled its responsibility of providing a concise but clear explanation of its reasons for the fee award." *In re Genetically Modified Rice Litig.*, 764 F.3d at 872 (internal quotation omitted). Migliaccio has failed to show that the court's decision amounted to an abuse of discretion.

### 4. Cy Pres *Distribution*

Class counsel requested a fee award of 33 percent of the Common Fund, or $7,166,666. The district court instead awarded 28 percent, or $6,020,000. Migliaccio argues the difference between these amounts should be distributed to class members

instead of to *cy pres* beneficiaries as contemplated by the terms of the settlement agreement. Essentially, he requests that the district court redraft the terms of the agreement to allow for an alternative method of fund distribution for the amount in question.

District courts do not rewrite settlement agreements. "[T]he power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed." *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986). Contrary to Migliaccio's characterizations on appeal, the court did not order the *cy pres* distribution of the difference in fees—the terms of the settlement agreement did. "[W]hile the settlement agreement must gain the approval of the district judge, once approved its terms must be followed by the court and the parties alike. . . . The terms of the settlement agreement are always to be given controlling effect." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 475–76 (5th Cir. 2011) (footnote omitted). Accordingly, we find no error.

III. *Conclusion*

We affirm the judgment of the district court.

_____